Filed on behalf of the Plaintiff
Affidavit of Susan Garnett
Exhibits "SG1" & "SG2"
Dated

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**                          **Case No 1:07-cv-01475**

**RE:**

**SECURITIES AND EXCHANGE COMMISSION**
                                                    **Plaintiff**

v

**MARK T DUCHESNE**
**JEFFREY A HAYDEN**
**GREGORY A MOFFIT**
**ROBERT S PARSLEY**
**NATIONWIDE CAPITAL CORPORATION**
                                                    **Defendants**

---

**AFFIDAVIT OF SUSAN GARNETT**

---

I, Susan Garnett, of The Old Print Works, 59-61 High Road, North Weald, Essex, CM16 6HP, Process Server acting under the instructions of Nabarro LLP, Lacon House, 84 Theobald's Road, London, WC1X 8RW **Make Oath** and say as follows:

1.      That I did at 08.55hrs (GMT) on Tuesday 25 March 2008 attend HM Prison Wandsworth, Heathfield Road, Wandsworth, London, SW18 3HS, where I personally served Mr Marc T Duchesne (prisoner number WA9516) with the following documents:

    i)      Summons in the above action, dated 16 August 2007 and accompanying documents
    ii)     Complaint in the above action, dated 16 August 2007

2.      A copy of the documents so served by me are exhibited hereto marked "SG1"

3.      A copy of a 'Return of Service' form duly signed and completed by me is exhibited hereto marked "SG2"

**SWORN at** 181 HIGH STREET      )
EPPING,                           )
IN THE COUNTY OF ESSEX            )
                                  )
**this** 28th **day of** APRIL **2008** )   Before me,

A Solicitor empowered to Administer Oaths

LAURA CLEASBY (SOLICITOR)

**FOSKETT, MARR, GADSBY & HEAD LLP**
**181 HIGH STREET, EPPING, ESSEX**
**CM16 4BQ   DX 40401 EPPING**

Filed on behalf of the Plaintiff
Affidavit of Susan Garnett
Exhibits "SG1" & "SG2"
Dated

**Case No 1:07-cv-01475**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**RE:**

**SECURITIES AND EXCHANGE**
**COMMISSION**
                              **Plaintiff**
          **v**

**MARK T DUCHESNE**
**JEFFREY A HAYDEN**
**GREGORY A MOFFIT**
**ROBERT S PARSLEY**
**NATIONWIDE CAPITAL**
**CORPORATION**
                              **Defendants**

-----------------------------------------------------

**AFFIDAVIT OF SUSAN GARNETT**

-----------------------------------------------------

**Nabarro LLP**
**Lacon House**
**84 Theobald's Road**
**London**
**WC1X 8RW**

**Tel:**     **+44 (0)20 7524 6000**
**Fax:**     **+44 (0)20 7524 6524**

Filed on behalf of the Plaintiff
Affidavit of Susan Garnett
Exhibit "SG1"
Dated

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**                    **Case No 1:07-cv-01475**

**RE:**

**SECURITIES AND EXCHANGE COMMISSION**
                                                          **Plaintiff**

v

**MARK T DUCHESNE**
**JEFFREY A HAYDEN**
**GREGORY A MOFFIT**
**ROBERT S PARSLEY**
**NATIONWIDE CAPITAL CORPORATION**
                                                          **Defendants**

-------------------------------------------------------------------------------------------------

**EXHIBIT OF SUSAN GARNETT**

-------------------------------------------------------------------------------------------------

This is Exhibit "SG1" referred to in the Affidavit of Susan Garnett

**SWORN at** 181 HIGH STREET    )
EPPING                          )
IN THE COUNTY OF ESSEX          )
                                )
**this** 28th **day of** APRIL **2008** )    Before me,

A Solicitor empowered to Administer Oaths

LAURA CLEASBY
(SOLICITOR)

**FOSKETT, MARR, GADSBY & HEAD LLP**
**181 HIGH STREET, EPPING, ESSEX**
**CM16 4BQ   DX 40401 EPPING**

Rev. 4/06

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

# INITIAL ELECTRONIC CASE FILING ORDER

Subsequent filings in this case must be made electronically using the Court's Electronic Case Filing System (ECF) pursuant to Local Rule 5.4.

ORDERED that counsel shall:

- Submit in paper, the original and copy of the complaint/notice of removal/petitions for habeas corpus and any accompanying papers (**not including summons and civil cover sheets**). Additionally, litigants are hereby required to provide those filings in PDF Format on a floppy disk or CD-Rom compact disk. The disk should be clearly labeled with the case number (if known) and the name of the parties. If unable to deliver the filing on a disk at the time of the new case filing, counsel should e-mail the initiating document and accompanying papers to dcd_cmecf@dcd.uscourts.gov by the close of business the day the new case was filed. Failure to supply electronic copies of the new case in a timely manner, will result in the attorney's name being added to the attorney non-compliant list and shared with the Court's ECF Judge's Committee. **Regardless of what option counsel chooses, the complaint/notice** of removal and accompanying papers must come to the Court as PDF documents. Each exhibit to the new case shall be in a separate PDF file. Failure to submit PDF versions of the complaint/notice of removal and other documents will delay the opening of the case in ECF.

- Register, if not previously registered, to become an electronic filer by completing and returning the enclosed ECF Registration Form found on the Court's Website at (www.dcd.uscourts.gov). The login and password are case specific and can be used for all cases.

- **Make all subsequent filings electronically. This is _mandatory_.**

- Have a PACER (Public Access to Court Electronic Records) account, in order to view dockets and documents. Call 1-800-676-6856 or visit www.pacer.psc.uscourts.gov for additional information.

- Schedule a training class at the Courthouse by going to the Court's ECF Internet Website (www.dcd.uscourts.gov/ecf.html). Also, filing instructions and an interactive tutorial can be found at this Internet Website.

BATES, J, JDB

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## ELECTRONIC CASE FILES
## Attorney/Participant Registration Form

## LIVE SYSTEM

This form shall be used to register for an account on the Court's Electronic Case Files (ECF) system and to subscribe to the ECF EMail (Listserver) notification service. Registered attorneys and other participants will have privileges both to electronically submit documents, and to view and retrieve electronic docket sheets and documents for all cases assigned to the Electronic Case Files system. Listserver subscribers receive email messages whenever the Court wishes to electronically notify ECF registrants of pertinent ECF information.

The following information is required for registration:

If you are appointed pro bono or pro hac vice, please provide the case number:  _____

First Name/Middle Initial/Last Name   _____ ____ _____

Last four digits of Social Security Number  _____

DC Bar ID#:   _____

Firm Name   _____

Firm Address   _____

_____

_____

Voice Phone Number   _____

FAX Phone Number   _____

Internet E-Mail Address   _____

By submitting this registration form, the undersigned agrees to abide by the following rules:

1.      This system is for use only in cases permitted by the *U.S. District Court for the District of Columbia.* It may be used to file and view electronic documents, docket sheets, and notices. Please visit the Court's ECF Internet, www.dcd.uscourts.gov, website to schedule training.

2.      Pursuant to Federal Rule of Civil Procedure 11, every pleading, motion, and other paper (except list, schedules, statements or amendments thereto) shall be signed by at least one attorney of record or, if the party is not represented by an attorney, all papers shall be signed by the party. An attorney's/participant's password issued by the court combined with the user's identification, serves as and constitutes the attorney's/participant's signature. Therefore, an attorney/participant must protect and secure the password issued by the court.

If there is any reason to suspect the password has been compromised in any way, it is the duty and responsibility of the attorney/participant to immediately notify the court. This should include the resignation or reassignment of the person with authority to use the password. The Court will immediately delete that password from the electronic filing system and issue a new password.

3.  An attorney's/participant's registration will not waive conventional service of a summons and complaint, subpoena, or other judicial process; submit the client to the jurisdiction of the Court; or operate as a consent to accept service of pleadings, documents, and orders in actions in which such attorney/participant has not entered an appearance.    An attorney's/participant's registration will constitute a waiver in law only of conventional service of other non-process pleadings, documents, and orders in the case.    The attorney/participant agrees to accept, on behalf of the client, service of notice of the electronic filing by hand, facsimile or authorized e-mail.

4.  Upon receipt of your login and password, you are strongly encouraged to change your password, which may be done through the Utilities function, to a name easily recalled. **You may be subjected to a fee, should the Clerk's Office have to create a new password for you, or alternatively,  you may be required to appear in person to receive your new password.**

5.  Attorneys who are active members of the bar of this Court, or government attorneys who are employed or retained by the United States, or who have been permitted to proceed *pro hac vice*, must file pleadings electronically.

Please return this form to:        U.S. District Court for the District of Columbia
                                   Attn:   Attorney Admissions
                                   333 Constitution Avenue NW, Room 1825
                                   Washington, DC  20001

Or FAX to:                         Peggy Trainum
                                   U.S. District Court for the District of Columbia
                                   (202) 354-3023

Applicant's Signature    _____

_____    _____    _____
Full Last Name              Initial of   Last 4 Digits SS#
                            First Name

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Nancy M. Mayer-Whittington
Clerk

## NOTICE OF RIGHT TO CONSENT TO TRIAL
## BEFORE UNITED STATES MAGISTRATE JUDGE

The substantial criminal caseload in this Court and the requirements of the criminal Speedy Trial Act frequently result in a delay in the trial of civil cases. Aware of the hardship and expense to the parties, counsel, and witnesses caused by the delays which are beyond the control of the Court, this notice is to advise you of your right to a trial of your case by a United States Magistrate Judge. By statute, 28 U.S.C. § 636(c), Fed.R.Civ.P.73 and Local Rule 502, the parties, by consent, can try their case by means of a jury trial or bench trial before a United States Magistrate Judge. Appeals from judgments and final orders are taken directly to the United States Court of Appeals for the District of Columbia Circuit, in the same manner as an appeal from a judgment of a District Judge in a civil case.

## WHAT IS THE PROCEDURE?

One of the matters you are required to discuss at the meet-and-confer conference mandated by Local Rule 206 is whether the case should be assigned to a United States Magistrate Judge for all purposes, including trial.

All parties must consent before the case is assigned to a Magistrate Judge for trial. You may consent at any time prior to trial. If you expressly decline to consent or simply fail to consent early in the case, you are not foreclosed from consenting later in the case. However, a prompt election to proceed before a Magistrate Judge is encouraged because it will facilitate a more orderly scheduling of the case.

Attached is a copy of the "Consent to Proceed Before a United States Magistrate Judge for All Purposes" form. Your response should be made to the Clerk of the United States District Court only.

## WHAT IS THE ADVANTAGE?

The case will be resolved sooner and less expensively. The earlier the parties consent to assigning the case to a Magistrate Judge the earlier a firm and certain trial date can be established, even if the case is to be tried to a jury.

Upon the filing of the consent form and with the approval of the District Judge, the case will be assigned for all purposes to a Magistrate Judge.

CO-942A
Rev 3/95
Rev 7/99

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| Plaintiff(s) ) | |
| ) | |
| v. ) | Civil Action No._____ |
| ) | |
| _____ ) | |
| Defendant(s) ) | |

## CONSENT TO PROCEED BEFORE
## A UNITED STATES MAGISTRATE JUDGE FOR ALL PURPOSES

In accordance with the provisions of 28 U.S.C. ' 636(c)(3), the parties to the above-captioned civil matter by and with the advice of their counsel hereby voluntarily waive their rights to proceed before a District Judge of the United States District Court and consent to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial.

_____
Attorney for the Plaintiff(s)

_____
Date

_____
Attorney for the Defendant(s)

_____
Date

NOTICE: The foregoing Consent by Counsel shall be accepted upon the understanding that all counsel have secured the consent of their respective clients to the Consent and Referral to a United States Magistrate Judge for all purposes.

## ORDER OF REFERENCE

IT IS HEREBY ORDERED that the above-captioned matter be referred to a United Sates Magistrate Judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C.' 636(c)(3) and the foregoing consent of the parties.

_____
United States District Judge

_____
Date

NOTE:    RETURN THIS FORM TO THE CLERK OF THE COURT ONLY IF ALL PARTIES HAVE CONSENTED
TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE.

CO-942B
Rev 3/95
Rev 7/99

AO 440 (Rev. DC - September 2003) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## District of Columbia

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

**SUMMONS IN A CIVIL CASE**

V.

MARK T. DUCHESNE;
JEFFREY A. HAYDEN;
GREGORY A. MOFFIT;
ROBERT S. PARSLEY; AND
NATIONWIDE CAPITAL CORPORATION,

Defendants,

CAS

Case: 1:07-cv-01475
Assigned To : Bates, John D.
Assign. Date : 8/16/2007
Description: General Civil

TO: (Name and address of Defendant)

Mark T. Duchesne
Last Known Address
3805 W. Alabama St.
#9205
Houston, TX 77027

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Donald N. Dowie
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-4010

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

NANCY MAYER-WHITTINGTON

CLERK

AUG 1 6 2007

DATE

(By) DEPUTY CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION
100 F STREET, N.E.
WASHINGTON, DC 20549-4010

                                        Plaintiff,

                                                        Civil Action No. _____

                        v.

                                                        **COMPLAINT**

MARC T. DUCHESNE
3805 W. ALABAMA STREET
#9205
HOUSTON, TX 77027

JEFFREY A. HAYDEN
4591 COMBS CANYON ROAD
CARSON CITY, NV 89703                   Case: 1:07-cv-01475
                                        Assigned To : Bates, John D.
                                        Assign. Date : 8/16/2007
GREGORY A. MOFFITT                      Description: General Civil
18 INDIAN CORN PLACE
CONROE, TX 77384

ROBERT S. PARSLEY
3764 GARNET STREET
HOUSTON, TX 77005

NATIONWIDE CAPITAL CORPORATION
18 INDIAN CORN PLACE
CONROE, TX 77384

                                        Defendants.

-1-

Plaintiff Securities and Exchange Commission alleges:

## NATURE OF THE ACTION

1.     In August and September, 2002, defendants Marc Duchesne, Jeffrey Hayden, Gregory Moffitt, and Robert Parsley carried out a scheme to manipulate the price of the common stock of Nationwide Capital Corporation.  Duchesne, Hayden, and Parsley manipulated the price of Nationwide stock by executing trades in Nationwide stock at highly inflated prices.  As part of the manipulative scheme, Defendants Duchesne and Moffitt, along with Nationwide, disseminated false and misleading information regarding Nationwide's financial condition and business prospects, including a false press release, false public filings, and a website and business plan presentation that falsely portrayed Nationwide and its business prospects.  The object of the scheme was to artificially inflate the price of Nationwide stock, to induce public investors to purchase Nationwide stock, to support Nationwide's attempt to acquire other companies, and to enable certain of the defendants to profit from selling Nationwide stock at artificially-inflated prices.  The scheme collapsed on October 1, 2002, when the Commission suspended trading in Nationwide securities.

2.     By engaging in this conduct, defendants, directly or indirectly, have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5], and/or Section 15(d) of the Exchange Act and Rules 15d-11 and 15d-13 thereunder [15 U.S.C. § 78o(d); 17 C.F.R. §§ 240.15d-11 and 240.15d-13].

## JURISDICTION

3.      This Court has jurisdiction of this action pursuant to Sections 20 and 22(a) of the Securities Act of 1933 [15 U.S.C. §§ 77t, 77v(a)], and Sections 20, 21(d), and 27 of the Exchange Act [15 U.S.C. §§ 78t, 78u(d), and 78aa].

4.      Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business alleged herein.

## DEFENDANTS

5.      **Marc T. Duchesne**, age 45, is a citizen of the United Kingdom who at all relevant times resided in Houston, Texas.  Duchesne used the alias "Carl von Wasserman" to conceal his fraudulent conduct in connection with the scheme alleged herein.  Duchesne secretly owned at least twenty-seven percent of Nationwide's outstanding shares of common stock, both in his own name and through various nominees, and controlled over ninety percent of the Nationwide common stock that was available to be publicly traded (the "public float").

6.      **Jeffrey A. Hayden**, age 50, is a resident of Carson City, Nevada.  During the relevant period, Hayden acted as a "shell broker" who assisted others to buy and sell dormant, publicly-traded corporate entities or "shell companies."  Hayden introduced Duchesne to individuals at one such shell company, Nationwide's predecessor company, Calwest Ventures, Inc.

7.      **Gregory A. Moffitt**, age 42, is a resident of Houston, Texas.  During the relevant period, Moffitt was president and chief executive officer of Nationwide, and was a controlling person of Nationwide.

-3-

8.    **Robert S. Parsley**, age 52, is a resident of Houston, Texas.  Parsley is a

commercial real estate broker in Houston.

9.    **Nationwide Capital Corporation** was a Nevada corporation based in Houston,

Texas during the relevant period.  Nationwide purportedly was a mortgage company, but it had

negligible assets and revenues and is now defunct.  During the relevant period, Nationwide

common stock was a "penny stock" within the meaning of Section 3(a)(51)(a) of the Exchange

Act and Rule 3a51-1 promulgated thereunder.  Nationwide's stock was quoted and traded on the

OTCBB prior to October 1, 2002.  On October 1, 2002, the Commission suspended trading in

Nationwide securities until October 15, 2002.

**OTHER RELEVANT ENTITIES**

10.    **Suisse Alliance** was a Nevada corporation that Duchesne falsely claimed was an

investment bank headquartered in Zurich, Switzerland.  Duchesne controlled Suisse Alliance, but

claimed that his alias, "Carl von Wasserman," was the head of Suisse Alliance.  Duchesne used

Suisse Alliance to facilitate his manipulation of Nationwide stock.

11.    **Calwest Ventures, Inc.** was a public shell company incorporated in California and

was subject to the filing requirements of Section 15(d) of the Exchange Act.  During the relevant

period, Calwest's stock was quoted on the OTCBB.  In July 2002, Calwest was acquired by

Duchesne and others and its name subsequently was changed to Nationwide Capital Corporation.

**FACTUAL ALLEGATIONS**

**Background**

12.    In early May 2002, Duchesne and Moffitt discussed how Duchesne could assist

Moffitt in financing a mortgage company that Moffitt wanted to form.  Duchesne, who claimed

to be an investment banker at a Swiss investment bank named Suisse Alliance, told Moffitt that

-4-

he would need $650,000 in order to start the business through a "reverse merger," by buying a public shell company that would then be used to acquire an existing mortgage company.

13.    On June 14, 2002, Moffitt's brother wired $665,000 directly to Duchesne's Suisse Alliance bank account. Duchesne told Moffitt's brother that Nationwide would repay him $800,000 within thirty to sixty days by giving Moffitt's brother 100,000 shares of Nationwide stock, and then buying those shares back from him at $8 per share.

14.    In July 2002, Duchesne and Hayden arranged to acquire Calwest Ventures, a public shell company. Hayden introduced Duchesne to Calwest's attorney to enable Duchesne to acquire the Calwest shell in furtherance of the fraudulent scheme. Duchesne, acting through Suisse Alliance and using the alias "Carl von Wasserman," agreed to purchase 4.9 million shares of Calwest, representing Calwest's entire public float, at approximately four cents per share. Around the same time, Duchesne arranged for himself (through various nominees) and others to purchase 11 million restricted shares of Calwest at approximately two cents per share.   After Duchesne acquired control over Calwest, he caused its name to be changed to Nationwide Capital Corporation.

## Duchesne Disguised His Control over Nationwide's Public Float

15.    After the Calwest transaction, Duchesne controlled at least twenty-seven percent of Nationwide's total outstanding shares, and approximately ninety percent of Nationwide's public float. By gaining control over Nationwide's public float, Duchesne, together with the other defendants, was able to manipulate the stock's price and maintain the price at artificially inflated levels.

16.    Duchesne secretly controlled almost all of Nationwide's public float through sham companies he created, or by using the names of people and entities without their knowledge or permission.  Duchesne also owned 533,000 Nationwide shares in his own name.

17.    Duchesne also directed Moffitt and another Nationwide employee to use two other shell companies – Time Capital Corporation and Premier International Holdings, Inc. – to conceal their ownership of additional Nationwide shares.  This created the false public appearance that legitimate, unrelated companies had invested in Nationwide, and obscured that Moffitt, an insider, owned substantial amounts of Nationwide stock.

18.    In addition to being a controlling shareholder of Nationwide, Duchesne exercised direct control over the company's finances and was significantly involved in the company's business affairs.  He also helped create the company's website and business presentation, and drafted corporate press releases.

19.    Duchesne also was responsible for approving and paying Nationwide's expenses from a bank account that he controlled in the name of Suisse Alliance.  Duchesne received into the bank account over $800,000 from Moffitt's brother and father that was intended to fund the purchase of the Calwest shell and, subsequently, the operations of Nationwide.  However, from June through August 2002, Duchesne used more than $300,000 from the Suisse Alliance bank account to pay for his personal expenses, salary, and stock purchases, and to make payments to Hayden.

### The Manipulation of Nationwide's Stock Price

20.    Duchesne, Hayden, and Parsley participated in a scheme to artificially inflate the price of Nationwide stock in order to profit from the eventual sale of their Nationwide shares, to attract investors, and/or to convince legitimate companies to be acquired by Nationwide.  The

scheme was orchestrated by Duchesne, and began with a matched trade between Duchesne and

Hayden that inflated Nationwide's stock price from pennies to $9.35 per share. Thereafter,

Duchesne, Hayden, and Parsley bought or sold Nationwide shares at inflated prices to increase

the price of Nationwide stock, to generate volume, and to prime the market for the manipulated

shares.

Duchesne and Hayden Began the
Manipulation With a Matched Trade

21.    In July and August 2002, Duchesne told executives of a private mortgage company

in Houston that (*i*) he "controlled" Nationwide's stock; (*ii*) although the stock was not actively

trading at that time, in a few weeks he would set the price at approximately $8 per share; and (*iii*)

he could set and maintain the price of Nationwide's stock for approximately sixty to ninety days.

Duchesne offered to have Nationwide acquire the private mortgage company for three million

shares of Nationwide stock at $8 per share.

22.    At an August 15, 2002 meeting between executives of the mortgage company and

Nationwide executives, a Nationwide employee told the executives that Duchesne controlled

Nationwide stock, and that the shares would start trading the next day at $8 per share. Duchesne

had instructed the Nationwide employee to tell the mortgage company executives this

information.

23.    On August 16, 2002, Duchesne and Hayden jump-started trading in Nationwide

stock by executing a manipulative matched trade at $9.35 per share. Prior to that trade, shares of

Nationwide stock had been quoted on the OTCBB at $.01 - $.02 per share. On the morning of

August 16, Hayden and Duchesne spoke by telephone, and Duchesne told Hayden that he wanted

the market for Nationwide shares to open around $9 per share. Duchesne and Hayden then

-7-

discussed a plan to have Hayden post an offer to sell 500 Nationwide shares at $9. At 10:09 a.m., Hayden entered a limit order to sell 500 shares of Nationwide stock at $9.35 per share. Between 10:09 and 2:18 p.m., there were three additional telephone calls from Duchesne to Hayden. At 2:18 p.m., Duchesne entered a limit order to purchase 500 Nationwide shares at $9.35 per share, which was executed with Hayden's matching order to sell. As a result of this matched trade, which was the only trade in Nationwide stock executed that day, the market price of Nationwide common stock rose to $9.35 per share and capitalization of Nationwide skyrocketed from $160,000 to over $148 million, a level that was grossly disproportionate to Nationwide's assets of $11,550 and revenues of $6,723 as of June 2002.

24.    Duchesne and Hayden knew, or were reckless in not knowing, that they were artificially inflating the price of Nationwide stock when they executed the matched trade, and that no real market existed for Nationwide stock.

25.    Between August 16 and August 26, 2002, Nationwide did not trade and, during the intervening period, the manipulated $9.35 per share price was quoted as the last price at which Nationwide shares had traded.

Duchesne and Hayden Orchestrated and
Engaged in Additional Manipulative Trades

26.    On August 27, Duchesne resumed trading in Nationwide stock and purchased 500 shares at $9.40 per share through his Suisse Alliance brokerage account. In a telephone call on August 27, 2002, Duchesne asked Hayden to buy 5,000 shares of Nationwide stock at highly inflated prices, in order to generate trading volume in the stock. Hayden was reluctant to buy that amount of Nationwide stock because he knew that the price of Nationwide stock had been artificially inflated, and that no real market existed for Nationwide stock. Duchesne, however,

assured Hayden that he had arranged for others to buy the shares from Hayden within an hour of Hayden's purchases. Hayden thereafter purchased 4,500 shares of Nationwide stock on August 27, at various prices at or near $9.25 per share.

27. Also on August 27, Duchesne coordinated prearranged trades between Hayden and others, enabling Hayden to sell 5,000 shares of Nationwide stock at prices between $8 and $9 per share. Specifically, Duchesne instructed a close relative of defendant Moffitt, Buyer A, to buy Nationwide stock at a price and in an amount dictated by Duchesne. Buyer A followed Duchesne's instructions and purchased 3,000 shares of Nationwide stock on August 27 at $9 per share. Hayden sold to Buyer A the 3,000 Nationwide shares that Buyer A purchased on that date.

28. Also on August 27, Duchesne telephoned another individual, Buyer B, and instructed him to buy Nationwide stock at a price and in an amount dictated by Duchesne. Buyer B acted on Duchesne's instructions and purchased 2,000 shares of Nationwide stock at the highly-inflated price of $9.20 per share. Moments later, Hayden was able to sell 2,000 shares of Nationwide stock at $8 per share.

29. Also on August 27, Duchesne instructed Hayden by telephone to post a bid shortly before the close of the market to buy Nationwide shares at an inflated price, in order to "mark the close" for the stock, and thereby ensuring that the stock would close for the day at an artificially inflated price. Hayden did so, and purchased 100 shares of Nationwide stock at $9.25 per share at or around 3:51 p.m. that day, causing the stock price to increase approximately eighty-three percent.

30. Duchesne and Hayden knew, or were reckless in not knowing, that the transactions in Nationwide stock that they had orchestrated and executed on August 27, 2002 were intended

to create the false impression that the price of Nationwide shares was rising and that there was market demand for the stock.

31.   On September 16, Hayden executed two matched trades between accounts that he controlled under different names at two different brokerage firms, buying and selling 1,500 shares of Nationwide stock at $8.90 per share and another 600 shares at $8.90 per share. These trades increased the price of Nationwide stock by 18.6 percent from the previous day's closing price. On September 25, Hayden also purchased 1,000 shares of Nationwide stock at the inflated price of $4.90 per share.

32.   Defendant Hayden profited by more than $280,000 from his sales of at least 66,900 shares of Nationwide stock during the period of the manipulation.

Duchesne and Parsley
Manipulated Nationwide's Stock Price

33.   On August 29, Duchesne telephoned Parsley and asked Parsley to purchase shares of Nationwide stock. Duchesne told Parsley that the price of Nationwide stock was dropping due to the activity of short sellers who had begun selling the stock, and he wanted Parsley to buy shares of Nationwide in order to manipulate the price of the stock. Duchesne assured Parsley that he would not lose money on the transactions. Parsley understood that Duchesne was asking him to participate in manipulating Nationwide stock, but Parsley nevertheless agreed to participate and purchased a total of 800 shares of Nationwide stock in four separate transactions on August 29, at successively higher prices, starting at $10.25 per share and executing his final purchase on that date at $18.75 per share. Each of Parsley's purchases of Nationwide stock was made at Duchesne's instruction, and at prices and amounts that Duchesne dictated to Parsley. In fact, Parsley was the only purchaser of Nationwide stock on that day.

-10-

34.    Duchesne and Parsley telephoned each other approximately thirteen times on August 29, to coordinate Parsley's manipulative trading, and almost all of the calls were placed either immediately before or after one of Parsley's trades on that day.  During those calls, Duchesne told Parsley at which prices and in what amounts to purchase Nationwide stock.

35.    As a result of Duchesne and Parsley's manipulation on August 29, the price of Nationwide stock increased from $9.15 to $18.75 per share, over 100 percent in one day.

36.    Parsley also purchased an additional 3,000 shares of Nationwide stock between September 4 and September 9, at prices between $11.75 and $12.65 per share.  The prices and amounts of each of those purchases also were dictated by Duchesne.

37.    Parsley knew that his purchases of Nationwide stock were manipulative and were intended to create a false and misleading appearance of an active and rising market for Nationwide stock.  Moreover, Parsley expected to profit by selling his Nationwide stock into an artificially inflated market.  Ultimately, after the Commission suspended trading in Nationwide stock, Parsley lost the approximately $50,000 that he had used to purchase his Nationwide shares.

38.    Duchesne knew, or was reckless in not knowing, that the prices at which he instructed Parsley to purchase Nationwide stock were manipulative and were intended to create a false and misleading appearance of an active and rising market for Nationwide stock.

### Duchesne, Moffitt, and Nationwide
### Disseminated False Information About Nationwide

#### False and Misleading SEC Filings

39.    On or about August 7, 2002, Nationwide filed with the SEC a report on Form 8-K that disclosed the change of control in Calwest.  Duchesne and Moffitt provided the information

to be included in the Form 8-K. Moffitt reviewed and signed the Form 8-K. Duchesne and Moffitt then caused the Form 8-K to be filed with the Commission on behalf of Nationwide.

40.    The Form 8-K was false and misleading, and omitted material information, in at least the following respects: (*i*) it falsely described Nationwide as a viable company with current operations; (*ii*) it falsely described an offshore entity as the purchaser of one million Nationwide shares; and (*iii*) it falsely claimed that Moffitt and another Nationwide officer each owned only 10.1 percent of Nationwide's outstanding shares, when in reality, Moffitt and the Nationwide officer owned twenty-five percent and nineteen percent of Nationwide's outstanding shares, respectively.

41.    Duchesne and Moffitt also failed to disclose in the Form 8-K: (*i*) that Duchesne was a control person of Nationwide; (*ii*) that the money for the purchase of Calwest stock had come from Suisse Alliance; and (*iii*) the terms upon which Suisse Alliance had received the funds from Moffitt's brother.

42.    On or about August 19, 2002, Duchesne and Moffitt caused Nationwide to file with the SEC a quarterly report on Form 10-QSB for the quarter ending June 30, 2002. The quarterly report also contained false and misleading information. For example, the quarterly report stated that an offshore entity was one of the purchasers of the Calwest shares, and that Nationwide had "conditional forward commitments for warehouse lines of credit" with three banks. Both of these statements were false and material. The quarterly report also referred readers to Nationwide's previously-filed false Form 8-K for "complete details" of the change in control.

43.    Duchesne and Moffitt knew, or were reckless in not knowing, that the statements made in Nationwide's Forms 8-K and 10-QSB were materially false and misleading.

### Duchesne and Moffitt Created Nationwide's False and Misleading
### Website and Business Plan Presentation

44.     Beginning in at least July 2002, Duchesne and Moffitt created a website for
Nationwide that was materially false and misleading in several respects.  Duchesne and Moffitt
drafted and reviewed the content of the website prior to posting it online.  Duchesne was the
website administrator.

45.     The Nationwide website falsely portrayed Nationwide as a successful mortgage
brokerage with ongoing operations and substantial financial resources, when, in fact, Nationwide
had no current operations and virtually no assets.  For example, the website stated that
Nationwide had "immense financial resources available to underwrite, close, and fund"
residential and commercial loans, when Nationwide had no such resources.  The website also
contained false and misleading statements about Nationwide's relationships with banks,
brokerage firms, and other well-known companies.  The website claimed that Microsoft,
Accenture, and Hewlett-Packard were Nationwide's "partners," when Nationwide had no
relationship with any of those companies.

46.     Duchesne and Moffitt knew, or were reckless in not knowing, that the statements
on the website were materially false and misleading.

47.     In August 2002, Duchesne and Moffitt created a business plan for the company that
they depicted in a Power Point presentation (the "Presentation").

48.     The Presentation contained numerous false and misleading statements about
Nationwide's historical and projected financial condition, lines of credit, business operations,
and the price of its stock.  For example, the Presentation contained a misleading chart comparing
Nationwide's stock performance against other established companies, such as American Express,

in the consumer financial services sector. The chart stated that Nationwide's earnings were 51 cents per share; that its average daily trading volume was 60,000 shares; and that the stock was trading at $9.35 per share. In reality, Nationwide had no earnings and its stock price had been set through a manipulative matched trade, as discussed above. The Presentation also falsely claimed that Nationwide had $210 million in lines of credit from various lenders and had private placement funding as a source for its lending activities. In fact, Nationwide had no such funding. This false and misleading Presentation also was posted on Nationwide's website.

49.    Duchesne and Moffitt knew, or were reckless in not knowing, that the statements made in the Presentation were materially false and misleading.

50.    Duchesne used the false Presentation in an attempt to convince an individual buyer to purchase 750,000 shares of Nationwide stock from Duchesne in a private transaction. Duchesne also used the Presentation as a marketing tool in an ultimately unsuccessful attempt to convince the management of a private Houston mortgage company to sell the company to Nationwide.

<u>Duchesne Caused Nationwide to Issue a False and Misleading Press Release</u>

51.    In a September 6, 2002 telephone call, Duchesne told Hayden that he wanted Nationwide stock to trade over $10 per share, and Hayden responded that the company needed "news."

52.    On September 25, 2002, Nationwide and a privately-held company, YCO Holdings, Inc., executed a letter of intent for the acquisition of YCO by Nationwide for one million shares of Nationwide stock at $8 per share, and $1 million in cash.

53.    Also on September 25, Duchesne purchased approximately 9,600 shares of Nationwide stock at artificially inflated prices in approximately seventeen transactions, in an

attempt to support the stock price and create the appearance of genuine trading activity in the stock.

54.    On September 27, Duchesne caused Nationwide to issue a press release that falsely announced Nationwide's "acquisition" of YCO, although the transaction had not yet closed. In fact, a "merger" agreement between the companies was not signed until October 3, two days after the Commission had suspended trading in Nationwide securities. Moreover, Nationwide did not have the funds necessary to consummate the merger with YCO.

55.    Also on September 27, Duchesne purchased Nationwide stock in approximately thirty transactions, in an attempt to support Nationwide's stock price that day.

56.    The press release also contained materially false and misleading statements about YCO's financial condition that created the appearance that Nationwide had acquired a profitable company. In fact, YCO had lost money in the previous two years and was projecting a loss for 2002.

57.    The press release falsely stated that: (*i*) YCO's projected earnings for 2003 were $2,668,000, when the actual projected amount was only $168,000; (*ii*) YCO's 2002 "gross margin" was $2.7 million, when the actual projected figure was $1 million; (*iii*) YCO's projected "gross" for 2003 was $9.1 million, when the actual projected amount was $5.9 million. The press release also created the false impression that YCO had an average growth rate of 270 percent per year, when YCO had no historic earnings growth.

58.    Duchesne was responsible for drafting and issuing the September 27 press release. Duchesne knew, or was reckless in not knowing, that the YCO press release contained numerous materially false and misleading statements as described above.

59.    To continue the manipulative scheme, on September 30, 2002, Duchesne bought and sold over 8,000 shares of Nationwide stock in approximately thirteen transactions to support the stock price and create the appearance of legitimate trading volume.

60.    Duchesne knew, or was reckless in not knowing, that his purchases of Nationwide stock from September 25 through September 30 were manipulative and designed to increase or support the stock price and give the appearance of legitimate trading volume in Nationwide stock.

### Duchesne Filed a False Schedule 13D

61.    The Commission suspended trading in Nationwide stock on October 1, 2002 because of concerns about the accuracy of the September 27 press release and other publicly available information, and the apparently manipulative trading.  Shortly thereafter, on October 7, Duchesne filed a Schedule 13D with the Commission.

62.    Duchesne filed the Schedule 13D to create the false impression that he had only recently acquired 720,000 shares of Nationwide stock from Suisse Alliance.  He stated falsely in the Schedule 13D that, because of the 720,000-share purchase from Suisse Alliance, he had become the beneficial owner of 8.38 percent of Nationwide's total outstanding shares.  In fact, as early as August 9, 2002, Duchesne owned and controlled at least twenty-seven percent of Nationwide's total outstanding shares, including the 720,000 shares he claimed to have recently purchased from Suisse Alliance.  Duchesne also attached to the Schedule 13D a purported arm's-length purchase agreement between himself and Suisse Alliance for the 720,000 Nationwide shares.  The purchase agreement, however, was a sham: Duchesne, posing as "Carl von Wasserman," had executed the agreement on behalf of Suisse Alliance, and on behalf of himself.

-16-

63.    At the time that he filed the Schedule 13D, Duchesne knew, or was reckless in not knowing, that the Schedule 13D contained false information.

## CLAIM ONE

### Violations of Section 17(a) of the Securities Act

64.    Paragraphs 1 through 63 are hereby realleged and incorporated by reference.

65.    Defendants Duchesne and Hayden, by engaging in the conduct described above, directly or indirectly, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of the securities of Nationwide:

    a.    employed devices, schemes, or artifices to defraud;

    b.    obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

66.    By reason of the foregoing, defendants Duchesne and Hayden, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## CLAIM TWO

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

67.    Paragraphs 1 through 66 are hereby realleged and incorporated by reference.

68.    Defendants Duchesne, Hayden, Moffitt, Parsley, and Nationwide, by engaging in the conduct described above, directly or indirectly, by use of the means or instruments of

transportation or communication in interstate commerce, or by use of the mails, or of any facility

of any national securities exchange, in connection with the purchase or sale of the securities of

Nationwide:

      a.   employed devices, schemes, or artifices to defraud;

      b.   made untrue statements of material facts or omitted to state material facts

           necessary in order to make the statements made, in the light of the circumstances

           under which they were made, not misleading; or

      c.   engaged in acts, practices, or courses of business which operated or would have

           operated as a fraud or deceit upon any person.

    69.  By reason of the foregoing, defendants Duchesne, Hayden, Moffitt, Parsley, and

Nationwide, directly or indirectly, violated, and unless restrained and enjoined will continue to

violate, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder [15 U.S.C. §

78j(b) and 17 C.F.R. § 240.10b-5].

**CLAIM THREE**

**Violations of Section 15(d) of the Exchange Act**
**and Rules 15d-11 and 15d-13 Thereunder**

    70.  Paragraphs 1 through 69 are hereby realleged and incorporated by reference.

    71.  Defendant Nationwide, by engaging in the conduct described above, failed to file

with the SEC current and quarterly reports that were accurate and not misleading.

    72.  By reason of the foregoing, defendant Nationwide violated, and unless restrained

and enjoined will continue to violate, Section 15(d) of the Exchange Act and Rules 15d-11 and

15d-13 thereunder [15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-11 and 240.15d-13].

## CLAIM FOUR

### Aiding and Abetting Violations of Section 15(d) of the Exchange Act and Rules 15d-11 and 15d-13 Thereunder

73.    Paragraphs 1 through 72 are hereby realleged and incorporated by reference.

74.    Defendants Duchesne and Moffitt knowingly provided substantial assistance to Nationwide's violations of the periodic reporting provisions of the Exchange Act.

75.    By reason of the foregoing, defendants Duchesne and Moffitt aided and abetted violations of Section 15(d) of the Exchange Act and Rules 15d-11 and 15d-13 thereunder [15 U.S.C § 78o(d) and 17 C.F.R. §§ 240.15d-11 and 240.15d-13].

**WHEREFORE,** Plaintiff Securities and Exchange Commission requests that the Court enter final judgment:

i.    Enjoining defendants Duchesne and Hayden, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act.

ii.    Enjoining defendants Duchesne, Hayden, Moffitt, Parsley, and Nationwide, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

iii.    Enjoining defendant Nationwide, and its agents, servants, employees, attorneys, and those persons in active concert or participation with it who receive actual notice by personal service or otherwise, from violating, directly or indirectly, Section 15(d) of the Exchange Act and Rules 15d-11 and 15d-13 thereunder.

iv.    Enjoining defendants Duchesne and Moffitt, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, and each of them, from aiding and abetting violations of Section 15(d) of the Exchange Act and Rules 15d-11 and 15d-13 thereunder.

v.    Permanently barring defendants Duchesne and Moffitt from acting as officers or directors of any issuer required to file reports pursuant to Sections 12(b), 12(g), or 15(d) of the Exchange Act.

vi.    Permanently barring defendants Duchesne, Hayden, Moffitt, and Parsley from participating in any offering of penny stocks.

vii.    Ordering defendants to account for and disgorge all proceeds they have obtained as a result of the illegal conduct described above, together with prejudgment interest.

viii.    Ordering defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

ix.    Granting such other relief as this Court may deem just and proper.

## JURY DEMAND

The plaintiff, the Securities and Exchange Commission, demands a trial by jury as to all claims so triable.

Dated: 8-16-07

Respectfully submitted,

Donald N. Dowie
Antonia Chion
Yuri B. Zelinsky
Michael A. Ungar
Ivonia K. Slade
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, D.C. 20549-4010
Phone: (202) 551-4471 (Dowie)
Fax: (202) 772-9245
Email: dowied@sec.gov

Affidavit of Susan Garnett
Exhibits "SG1"
Dated

## Case No 1:07-cv-01475

**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

**RE:**

**SECURITIES AND EXCHANGE
COMMISSION**
                          **Plaintiff**
          **v**

**MARK T DUCHESNE
JEFFREY A HAYDEN
GREGORY A MOFFIT
ROBERT S PARSLEY
NATIONWIDE CAPITAL
CORPORATION**
                          **Defendants**

---------------------------------------------------

**EXHIBIT OF SUSAN GARNETT**

---------------------------------------------------

**Nabarro LLP
Lacon House
84 Theobald's Road
London
WC1X 8RW**

**Tel:** +44 (0)20 7524 6000
**Fax:** +44 (0)20 7524 6524

Filed on behalf of the Plaintiff
Affidavit of Susan Garnett
Exhibit "SG2"
Dated

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**                                    **Case No 1:07-cv-01475**

**RE:**

**SECURITIES AND EXCHANGE COMMISSION**
                                                                        **Plaintiff**

                                    v

                    **MARK T DUCHESNE**
                    **JEFFREY A HAYDEN**
                    **GREGORY A MOFFIT**
                    **ROBERT S PARSLEY**
            **NATIONWIDE CAPITAL CORPORATION**
                                                                        **Defendants**


-------------------------------------------------------------------------------------------

                        **EXHIBIT OF SUSAN GARNETT**

-------------------------------------------------------------------------------------------


This is Exhibit "SG2" referred to in the Affidavit of Susan Garnett




**SWORN at** 181 HIGH STREET    )
 EPPING                          )
 IN THE COUNTY OF ESSEX          )
                                 )
**this** 28ᵗʰ **day of** APRIL **2008** )    Before me,


                                                    FOSKETT, MARR, GADSBY & HEAD LLP
                                                    181 HIGH STREET, EPPING, ESSEX
A Solicitor empowered to Administer Oaths CM16 4BQ   DX 40401 EPPING

        LAURA CLEASBY (SOLICITOR)

AO 440 (Rev. DC - September 2003) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | 25ᵗʰ MARCH 2008 |
| NAME OF SERVER *(PRINT)* | TITLE  MS SUSAN GARNETT |

*Check one box below to indicate appropriate method of service*

☑ Served personally upon the defendant.  Place where served: HM PRISON WANDSWORTH
HEATHFIELD ROAD, WANDSWORTH, LONDON, SW18 3HS

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

☐ Other (specify): _____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on   25 March 2008          S Garnett
              _____    _____
                    Date                Signature of Server

                        59-61 HIGH ROAD, NORTH WEALD,
                        _____
                        Address of Server
                        ESSEX, CM16 6HP  (U.K.)

---

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

Filed on behalf of the Plaintiff
Affidavit of Susan Garnett
Exhibits "SG2"
Dated

**Case No 1:07-cv-01475**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**RE:**

**SECURITIES AND EXCHANGE**
**COMMISSION**
                            **Plaintiff**
              **v**

**MARK T DUCHESNE**
**JEFFREY A HAYDEN**
**GREGORY A MOFFIT**
**ROBERT S PARSLEY**
**NATIONWIDE CAPITAL**
**CORPORATION**
                        **Defendants**

-----------------------------------------------------

**EXHIBIT OF SUSAN GARNETT**

-----------------------------------------------------

**Nabarro LLP**
**Lacon House**
**84 Theobald's Road**
**London**
**WC1X 8RW**

**Tel:**    +44 (0)20 7524 6000
**Fax:**    +44 (0)20 7524 6524